# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **GREGORY DENNIS BUTLER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  CV 03-P-3296-S** |
| | } | |
| **180 CONNECT, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

The court has before it Defendant 180 Connect, Inc.'s Motion for Summary Judgment. (Doc. # 24). The motion has been fully briefed and was under submission, without oral argument, as of December 15, 2004. (Docs. # 8, 12).

Plaintiff Gregory Dennis Butler ("Butler") alleges that 180 Connect, Inc. ("180 Connect") breached a contract by failing to issue stock options to him.[1]  Defendant's motion for summary judgment asserts that no genuine issue of material fact exists and that Defendant is entitled to judgment as a matter of law.  (Doc. # 24).  The court, having considered the briefs and evidentiary submissions, finds that Defendant's motion is due to be granted.

---

[1] Although the  Although Plaintiff's complaint contained two counts, breach of contract and fraud, Plaintiff abandoned his fraud claim by failing to respond to Defendant's summary judgment arguments concerning this claim.  *See, e.g., Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd*, 44 F.3d 1008 (11th Cir. 1995) ("Summary Judgment is appropriate since plaintiff failed to respond to [defendant's] argument on this issue.") (citations omitted).  In any event, summary judgment would have been appropriate on the fraud claim.  To establish a fraud claim, a plaintiff must show, among other things, that he relied to his detriment on the alleged misrepresentation. *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So.2d 1143, 1160 (Ala. 2003); *Liggett Group, Inc. v. Engle*, 853 So.2d 434, 446 (Fla. 2003).  Plaintiff alleges that he declined an offer of employment with another company in reliance on 180 Connect's promises to him about stock options.  There is no evidence in the record to support this allegation.  In fact, Plaintiff's testimony that he "can't say for certain" whether he would have accepted another employment opportunity "but for" the alleged promise of stock options belies any reliance.  (Pl.'s Dep. Vol. I. at 219).

## I.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323.  Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## II.     Relevant Undisputed Facts[2]

180 Connect is a business that provides technical support for cable television and satellite dish companies.  (Pl. Dep., Vol. I, at 9-10).  180 Connect was formed in 2003 when several

---

[2] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

companies combined, and an Initial Public Offering ("IPO") was made in April 2004.  (Simons Dep., at 120-21, 12-13, 21-22).[3]  From June 2002 until October 13, 2003, Plaintiff was employed by 180 Connect (or its predecessor) as a Regional Director of Operations ("RDO").  (Pl. Dep., Vol. I, at 8, 83).  At all times, Plaintiff was an at-will employee.  (Pl. Dep., Vol. I, at 133-35).

### A.    Elimination of the Vice President Positions

For the first ten months of his employment, Plaintiff reported directly to James Cole, Vice President of 180 Connect's Southern Division.  (Pl. Dep. Vol. I, at 85, 133).  In 2003, Keith Steeves, the newly hired "President of Cable," decided to eliminate the Vice President positions, including the position occupied by Cole.  (Steeves Dep., at 29-33, 64-65).  Steeves was concerned that this change might upset Plaintiff and the other RDOs and consequently make them vulnerable to the recruiting efforts of competitors.  (*Id.* at 37, 50-52).  Therefore, Steeves asked the President and CEO of 180 Connect, Barry Simons, to approve an enhanced compensation plan for the RDOs.  (*Id.* at 36-37, 39-45, 60).  The plan that Steeves proposed included a 10% salary increase, a new bonus structure, and participation in an employee stock option plan ("ESOP").  (*Id.* at 39-45, Ex. 2).

Simons approved the salary increase and the new bonus structure in 2003, some time before the IPO in April 2004.  (Steeves Dep., at 42, 60-61, 83-84, Ex. 20).  However, Simons advised Steeves that the ESOP would have to be approved by the Board of Director's Compensation Committee and then by the Board of Directors itself.  (Simons Dep., at 119; Steeves Dep., at 44, 60-61, Ex. 20).  Simons, who was a member of the Board, anticipated that the Board would create an ESOP once the IPO plans became more definite, and he was confident that the RDOs would be eligible to participate in the ESOP.  (Simons Dep., at 81-83, 88).  Therefore, Simons and Steeves

---

[3] Prior to 2004, 180 Connect was a subsidiary of a holding company.  (Simons Dep., at 11-12, Ex. 1).

determined that the RDOs could be advised that they would be eligible to participate in a stock option pool, "subject to Board approval." (Steeves Dep., at 43-44, 60-61, 65-66, Ex. 20).

**B.     The May 13, 2003 Meeting**

On May 13, 2003, Cole's employment was terminated. (Steeves Dep., at 37). That same day, Steeves and Ed Strojan, the Senior Vice President of Human Resources, held a meeting with individuals who had reported to Cole, including Plaintiff. (*Id*. at 38, 55). During that meeting, Steeves explained his reasons for eliminating the Vice President positions and outlined the basic terms of the compensation plan that he had proposed. (*Id.* at 38, 56-57). As part of that discussion, Steeves told the attendees that they would be eligible to participate in a stock option pool, subject to Board approval. (*Id.* at 43-45, 60-61).

**C.     The May 16, 2003 Memo**

After the meeting, Steeves prepared a memo, dated May 16, 2003, summarizing the agreement discussed. (Steeves Dep., at 55-56, Ex. 4). The memo confirmed that Plaintiff would receive a 10% salary increase and outlined the terms of the new bonus structure. (*Id*). With respect to stock options, the memo stated:

> You will immediately be place [*sic*] in the option pool. I have asked Ed Strojan to determine the amount of options that we have to allocate. An allocation will be made to you in no less than 60 days, 1/3 of these options will be vested immediately based upon the results that you have produced to date with the remaining 2/3rds vesting over a 2-3 year period.

(*Id*). Steeves sent this memo to Plaintiff via e-mail. (Pl. Dep. Vol. I, at 153-54). Steeves' May 16, 2003 memo is the only written memorandum that Plaintiff received regarding stock options. (Pl. Dep. Vol. I, at 241, 260-63, 264; Pl. Dep. Vol. II, at 314).

**D.     Plaintiff's Job Offer From Broadband Digital Solutions, Inc.**

Shortly thereafter, Cole, who was now working at Broadband Digital Solutions, Inc., offered

Plaintiff a job with his new company.  (Pl. Dep. Vol. I, at 209-11).  Plaintiff was offered $35,000 per-year less than his salary at 180 Connect.  (*Id.* at 210-11, 216).  Plaintiff testified that the job would have required him to live and work in Orlando, Florida, which was not appealing to him.  (*Id.* at 213-14).  Plaintiff declined the offer because:  "In the end, it just wasn't worth moving to Orlando, in my opinion, for that one job at that pay."  (*Id.* at 211-13, 215-16).  After Plaintiff declined, Cole offered it to another 180 Connect RDO, who accepted.  (*Id.* at 221-24; Dec. of Steeves, ¶¶ 4-5).  Plaintiff testified that any opportunity that he had with BDS ended when Cole offered the job to another person.  (*Id*).

### E.    Events Regarding The Prospective ESOP

After the May 16 memo was issued, Simons raised the ESOP issue with a member of the Board of Directors and the Chairman of the Board's Compensation Committee.  (Simons Dep., at 81-82, 83-84).  At that time, the Board of Directors was still assessing how the IPO should be structured and was considering the possibility of reorganization.  (*Id.* at 82, 120).  Because a potential reorganization would change the nature and value of the stock, it was agreed that there was "no point trying to put an option pool in place [prior to] . . . the reorganizing of the company."  (*Id.* at 82, 99).

During the Summer of 2003, Steeves contacted Simons on five or six occasions to inquire about the status of the stock option allocation for the RDOs.  (Simons Dep., at 76, 85-91; Steeves Dep., at 79-80).  Simons advised Steeves that the creation of an employee stock option pool would be on hold until after the restructuring was completed.  (Simons Dep., at 87-88).

On August 18, 2003, Plaintiff sent Steeves an e-mail regarding the stock option issue.  (Pl. Dep. Vol. I, at 259, Ex. 16).  In that e-mail, Plaintiff wrote:

> I also look forward to getting something in writing on the options.  I know you are pushing, but if you get run over by a truck, the push would stop.  How long

will it be before I know where I stand?

(*Id*).  Plaintiff felt that he was "completely in the dark" about the prospective stock options.  (*Id.* at 264).  As of August 18, Plaintiff did not know how many options would be allocated to him, what rules would be in place for exercising the options, or what his "strike price" would be.  (*Id.* at 261-64, 270).

Sometime after the August 18 email, Steeves told Plaintiff that he would be "in the option pool with 40,000 shares allocated to [him]."  (Pl. Ans. to Def. First Set of Interr., No. 8; Pl. Ans. to Def. Second Set of Interr., No.  3; Pl. Dep. Vol. I, at 259-64, Ex. 16; Pl. Dep. Vol. II, at 342, 344-46, 361).[4]  Plaintiff and 180 Connect never reached an understanding concerning the strike price at which shares of stock could be purchased.  (Pl. Dep. Vol. I, at 63, 70, 235, 246, 263-65; Pl. Dep. Vol. II, at 308, 320-22, 327, 340, 376-77).   The lack of an agreed-upon strike price left Plaintiff "without any knowledge of what the value" of the prospective options would be, and left him unable to determine whether the options would have any value at all.  (Pl. Dep. Vol. I, at 245-46, 263-65; Pl. Dep. Vol. II, at 321-22, 327, 376-77).   Plaintiff and 180 Connect also never reached an understanding concerning the following items: (1) the amount of time that he would have to exercise vested options (*i.e.*, the "exercise period") (Pl. Dep. Vol. II, at 326-27, 340-41, 379-80); (2) the expiration date for any options that might be granted to him (Pl. Dep. Vol. II, at 326-27, 340-41, 379-80); (3)  whether, or to what extent, he could exercise his options post-termination (Pl. Dep. Vol. I, at 68, 236-37, 239; Pl. Dep. Vol. II, at 326-27, 340-42, 379-80, 383-84, 389); or (4) what type of shares (*i.e.*, Class A, Class B, common stock, etc) he would have the option to purchase (Pl. Dep. Vol. II, at 341).

---

[4] Defendant disputes that Steeves told Plaintiff that he would be allocated 40,000 shares and for purposes of this motion the court will treat this as a disputed fact.

In August 2003, it was decided that Steeves' employment with 180 Connect would end in the latter part of 2003. (Simons Dep., at 93-96). On September 18, 2003, Steeves sent Simons an e-mail that contained a recommended stock option allocation for each of Steeves' direct reports. (*Id*. at 93-95, 99-101, Ex. 9). In that e-mail, Steeves recommended an allocation of 40,000 options for Plaintiff. (*Id*). When this e-mail was sent, the pre-IPO restructuring had not yet been completed so no action could be taken on the recommendation. (*Id*. at 21-22, 81-82).

**F.   The Termination Of Plaintiff's Employment**

In the Fall of 2003, Steeves decided to eliminate Plaintiff's position. (Steeves Dep., at 105). Plaintiff's employment ended on October 13, 2003. (Pl. Dep. Vol. I, at 8). An employee stock option pool was created after Plaintiff left the company, and stock options were granted to those RDOs and other managers who were employed by 180 Connect at that time. (Simons Dep., at 51-52; Strojan Dep., at 86-91).

**III.   Applicable Substantive Law and Analysis**

As a threshold matter, because the court's jurisdiction in this case is premised on diversity, the court must first determine the appropriate choice of law principles applicable to Plaintiff's state law breach of contract claim. In Alabama, there are two choice of law rules governing contracts: (1) those cases involving the validity or formation of the contract; and (2) those cases in which the parties are litigating performance under a contract. *See Jones v. Jones*, 18 Ala. 248, 250 (1850); *Macey v. Crum*, 30 So.2d 666, 669 (Ala. 1947). On one hand, where a dispute is based on the existence or validity of a contract, "[i]t is a principle of law, admitted by all courts, that the *lex loci contractus* [the law of the place where the contract was made] must govern as to the validity, interpretation, and construction of the contract." *Jones*, 18 Ala. at 250. In this case, the facts indicate that the contract was executed in either Florida or Alabama. (Doc. # 25, at 8). On the other

hand, the *lex fori* rule [the law of the forum] applies to cases in which the existence or validity of the contract is admitted but the performance under the contract or the remedy for breach is at issue. *Macey*, 30 So.2d at 669.  In this case, the forum is Alabama.

It appears to the court that there is a dispute concerning which choice of law rule governs this case.  Defendant argues that no valid contract existed in the first instance, which would require the application of either Florida or Alabama law under the *lex loci contractus* rule, while Plaintiff maintains that the contract has been breached, which would suggest the application of Alabama law under the *lex fori* rule.  The court need not decide which approach governs the dispute in this case, however, because there is no appreciable difference between Alabama law and Florida law with respect to the issues in this case.  Accordingly, the court's analysis will make reference to the applicable law from both states.

Turning to the substantive analysis of Plaintiff's claim, the law is clear that to substantiate his breach of contract claim, Plaintiff must first prove that an enforceable contract existed. *Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am., Inc.*, 611 So.2d 564, 565 (Fla. DCA 1993); *Cocke v. Odom,* 385 So.2d 1321, 1322 (Ala. Civ. App. 1980).  To satisfy this requirement, Plaintiff must show (among other things) that: (1) he and 180 Connect reached a mutual agreement as to the essential terms of a stock option contract; and (2) the alleged contract was supported by consideration.  *Slovik v. Prime HealthCare Corp.,* 838 So.2d 1054, 1057 (Ala. Civ. App. 2002); *St. Joe Corp. v. McIver*, 875 So.2d 375, 381 (Fla. 2004).  The court finds that neither requirement has been satisfied in this case.[5]

_____

[5] Defendant contends that the alleged contract is governed by the Statute of Frauds because it could not have been performed within one year.  Under the Statute of Frauds, "any agreement that is not to be performed within the space of one year from the making thereof" is void and unenforceable unless it is "in writing and signed by the party to be charged therewith."  Fla. Stat. Ann. § 725.01; Ala. Code § 8-9-2.  Under the terms of the alleged agreement, one-third of Plaintiff's

A.    **The May 16 Memo Does Not Evidence a** "**Meeting of the Minds**" **as to the Essential Terms of a Stock Option Contract**

Defendant argues, and Plaintiff does not rebut, that the essential terms of a stock option contract include: (1) the "strike price" (or "exercise price") at which the stock may be purchased; (2) the number of shares that the option holder may purchase; (3) the type of shares that may be purchased (*e.g.,* Class A, Class B, common stock, etc.); (4) the fixed period of time during which vested options may be exercised (*i.e.,* the "exercise period"); and (5) the date when the options expire. *See, e.g.*, *McMillan, LTD v. Warrior Drilling and Eng'g Co.*, 512 So.2d 14, 21 (Ala. 1987)(defining an option contract as "'a contract by which the owner of property agrees with another, that he shall have the right to buy the property at a fixed price within a certain time'"); *Frissell v. Nichols*, 114 So. 431, 433 (Fla. 1927)(same); *see also Sugerman v. MCY Music World, Inc.*, 158 F.Supp.2d 316, 324-25 (S.D.N.Y. 2001)(finding that the material terms of a stock option agreement include "how many options might be granted of what class of stock; . . . the option term; the exercise price; and the expiration date"); *Lieberman v. StorageNetworks, Inc.,* 2004 WL 360489

---

stock options were to be "vested immediately," and the remaining two-thirds were to vest "over a 2-3 year period." (Pl. Dep. Vol. II, at 327-28, 358-59, 366-68, Ex. 14). Defendant maintains that, because of the "2-3 year" vesting period, the agreement could not have been performed within one year. *See Ex parte Ramsey*, 829 So.2d 146, 155-56 (Ala. 2002)(holding that an agreement that called for a doctor to practice in Grove Hill for "two to three years" was governed by the Statute of Frauds); *Green v. Royal Palm Beach Colony, Inc.*, 292 So.2d 388, 389 (Fla. DCA 1974)(holding that an agreement to employ the plaintiff "for the next three years" was governed by the Statute of Frauds). Plaintiff maintains that the Statute of Frauds does not apply to this case because at least a portion of the agreement could have been performed within one year. The court need not decide whether the Statute of Frauds applies in this case, however, because the result is the same. The law of the Statute of Frauds -- like the general contract law discussed herein -- requires that the "written embodiment of the agreement disclose all of the essential terms" and "demonstrate[] that there was a meeting of the minds" as to those terms. *Cavallaro*, 784 So.2d at 621; *Allen v. Berry*, 765 So.2d 121, 122 (Fla. DCA 2000); *see also Davis v. Barnfield*, 833 So.2d 58, 62 (Ala. Civ. App. 2002). Thus, the court's analysis is the same, regardless of whether general contract law or the Statute of Frauds applies to the terms of the subject agreement.

*2 (Mass. App. Ct. 2004)(finding that the essential terms of a stock option agreement include "the exercise price of the stock options"); *Imbrogno v. MIMRx.Com, Inc.*, 2003 WL 22707792 *4 (Ohio Ct. App. 2003)(finding that the essential terms of a stock option contract include "the number of options, the exercise period, the vesting schedule, [and] the strike price").

It is undisputed that the May 16 memo is the only written memorandum that Plaintiff received regarding stock options.  (Pl. Dep. Vol. I, at 241, 260-63, 264; Pl. Dep. Vol. II, at 314).  It is further undisputed that the May 16 memo does not disclose – much less evidence a meeting of the minds regarding – many of the above-referenced essential terms, including the strike price, the amount of time to exercise vested options, the quantity of shares available, the type of shares available, and the transferability of the options.

Thus, to the extent that a meeting of the minds was reached about any of these terms, it must be demonstrated by parol evidence, the admissibility of which is questionable given the existence of a document which arguably memorializes the parties' agreement regarding stock options.  The court need not determine whether parol evidence is admissible in this case, however, because it is undisputed that most – if not all – of the essential terms outlined above were never discussed or contemplated by the parties.  In fact, the only one of the above terms about which Plaintiff has offered *any* evidence is the quantity of shares available.[6]  Plaintiff's parol evidence consists solely

---

[6] Plaintiff has admitted that no understanding was ever reached as to the amount of time that he would have to exercise vested options (*i.e.*, the "exercise period"), and that he was never advised about the expiration date for any of his options.  (Pl. Dep. Vol. II, at 326-27, 340-41, 379-80).  *See Developers Mgmt. Assocs., Inc. v. Eagle Creek Holdings, Inc.*, 636 So.2d 91, 92 (Fla. DCA 1994)("It is generally accepted that an option . . . with an unlimited time to exercise the option is an unreasonable restraint on alienation").  Plaintiff also admitted that he and 180 Connect never reached an understanding as to whether, or to what extent, he could exercise his options post-termination, as to the type of shares (*i.e.,* Class A, Class B, common stock, *etc.*) that he would be allowed to purchase, or as to whether (or to what extent) the options were transferable.  (Pl. Dep. Vol. I, at 68, 236-37, 239; Pl. Dep. Vol. II, at 326-27, 340-42, 379-80, 383-84, 389).

of his testimony that Steeves told him that 40,000 options were being allocated to him.  (Pl. Dep. Vol. II, at 361, 383-85).  This is not sufficient to evidence a meeting of the minds as to the essential terms of a stock option contract.  "So long as any essential matters remain open for future consideration, there is no completed contract."  *Jacksonville Port Auth. v. W.R. Johnson Enter., Inc.* 624 So.2d 313, 315 (Fla. DCA 1993).[7]

Most strikingly, there is no evidence – parol or otherwise – that the parties agreed to the price term, and that fact alone is fatal to Plaintiff's claim. (Pl. Dep. Vol. I, at 63, 235, 246, 263-65; Pl. Dep. Vol. II, at 308, 320-22, 340).  Plaintiff acknowledged that the lack of an agreed-upon strike price left him "without any knowledge of what the value" of his options were, and that this missing term made it impossible to determine whether his options had *any* value.  (Pl. Dep. Vol. I, at 245-46, 263-65; Pl. Dep. Vol. II, at 321-22, 327, 376-77).  *See also Frissell*, 114 So. at 433 (explaining that an option contract conveys "a right to purchase as per the terms designated therein"); *Stagner v. Hardy*, 528 So.2d 871, 872 (Ala. Civ. App. 1988)("Until the option is exercised in accordance with its terms, the optionee does not have any right to or interest in the [underlying] property").   In fact, Plaintiff admitted that the strike price was an essential term of the agreement – so essential, in fact, that it alone would determine whether Plaintiff decided to exercise his stock options.  When asked if he had planned to exercise his options, Plaintiff answered: "It would depend on the strike price." (Pl. Dep. Vol. II, at 376).

---

[7] The court notes that, ironically, even if parol evidence were admissible in this case, it only further hinders *Plaintiff's* case.  If the court considers the parol evidence of the alleged promise of 40,000 shares, the court must also consider the parol evidence of the May 13 meeting wherein Plaintiff was informed that the Board of Directors had to approve any stock options before they became a valid part of the agreement.  (Steeves Dep. at 43-45, 60-61). The representations made at that meeting indicate that there was no meeting of the minds as to the finality of the ESOP or even the existence of a stock options pool.  In fact, the stock options "pool" in which the May 13 memo indicates Plaintiff was "immediately [] place[d]" did not even exist at the time of the May 16 memorandum.  (Simons Dep., at 81-82, 83-84).

Q.     And as you sit here today, . . . if you had had your options in your back pocket this whole time, you don't know if you would have exercised your options yet; right?

A.     No, not without knowing the strike price.

(*Id.* at 377).

Because the May 16 memo does not evidence a "meeting of the minds" as to all the essential terms of a stock option agreement, it does not constitute an enforceable agreement, and summary judgment for Defendant on Plaintiff's breach of contract claim is appropriate for this reason alone.[8]

### B.     The Alleged Contract Was Not Supported by Valid Consideration

Even if Plaintiff could show that a meeting of the minds occurred as to the material terms of the contract, he has not demonstrated the existence of valid consideration. "'A binding option contract requires a valuable consideration.'" *Crowley v. S.E. Bass*, 445 So.2d 902, 903 (Ala. 1984); *Donahue v. Davis,* 68 So.2d 163, 170 (Fla. 1953). "[T]o constitute consideration for a promise, there must have been an act, a forbearance, a detriment, or a destruction of a legal right, or a return promise, [that was] bargained for or given in exchange for the promise." *Ex parte Grant,* 711 So.2d 464, 465 (Ala. 1997); *Office Pavilion S. Fla., Inc. v. ASAL Prod., Inc.*, 849 So.2d 367, 370 (Fla. 4th DCA 2003). If an option is not supported by some bargained-for consideration, it "is a mere gratuity," which is not enforceable. *Crowley*, 445 So.2d at 903; *Donahue*, 68 So.2d at 170.

During his deposition Plaintiff was asked what his "end of the bargain" was with respect to the alleged stock option agreement. Although Plaintiff initially stated that his consideration was

---

[8] At most, the evidence might suggest that Plaintiff and 180 Connect had an "agreement to enter into a contract upon terms to be afterwards settled." Such an agreement "amounts to nothing" and "is not a contract at all." *See Cowan v. Salmon*, 13 So.2d 190, 195 (Ala. 1943)("An agreement to enter into a contract upon terms to be afterwards settled between the parties is incomplete on its face, and amounts to nothing"); *John I. Moss, Inc. v. The Cobbs Co.*, 198 So.2d 872, 874 (Fla. DCA 1967)(holding that "if the . . . contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all").

12

"[t]o remain an employee," he corrected himself by stating, "actually, this [the prospective allocation of stock options] was a reward for the work I had already done." (Pl. Dep. Vol. I, at 250, 253, 255). Plaintiff testified that, "as far as [he] was concerned," he owned the stock options as soon as he received the May 16 memo and he "didn't have to do anything further." (*Id.* at 253, 255). According to Plaintiff, the "agreement" was that he would "get a third now and . . . two thirds down the road," and "[t]here were no stipulations tied to this . . . ." (*Id.* at 333, 368-370).

The courts have distinguished between "a promise by an employer to his employee to give a . . . benefit, conditioned upon the doing of an act, followed by the compliance with the condition;" and "an unconditional bestowing of a benefit . . . without costs to the employee." *Meyerson v. New Idea Hosiery Co.*, 115 So. 94, 98 (Ala. 1928); *Parrish v. Gen. Motors Corp.*, 137 So.2d 255, 258 (Fla. DCA 1962). "In the first instance, upon compliance with the condition, there is a binding contract, supported by a sufficient consideration, [but] . . . in the other [instance], there is an absence of all of the elements of a contract -- a mere gratuity." *Meyerson*, 115 So. at 98; *Parrish*, 137 So.2d at 258 (holding that a bonus plan was not a contract because "the plan . . . partakes of gratuity while lacking essential elements of contractual obligation").

Plaintiff testified that the options were promised to him as "a reward" for work that he had performed in the past. (Pl. Dep. Vol. I, at 250, 253, 255). Such rewards are "purely gratuitous undertaking[s]," and such "past consideration" is no consideration at all. *Texaco, Inc. v. Giltak Corp.*, 492 So.2d 812, 814 (Fla. DCA 1986)(holding that "[p]ast consideration generally will not support a new promise to pay" and that some "[n]ew consideration is required"); *City of Miami Beach v. Fryd Constr. Corp.,* 264 So.2d 13, 14-15 (Fla. DCA 1972)(recognizing that "past consideration is not legal consideration"); *Kelley v. Spencer*, 105 So. 802, 804 (Ala. 1925)(holding that "if the alleged promise . . . was made after the contract of purchase and sale was complete, it was

a purely gratuitous undertaking, and . . . without consideration to support it").   It appears from Plaintiff's own testimony that consideration was lacking, and for this alternative reason, Defendant's motion for summary judgment is due to be granted.

**IV.      Conclusion**

For the reasons stated above, Defendant's motion for summary judgment is due to be granted. The court finds that no genuine issues of material fact remain for trial and that Defendant is entitled to judgment as a matter of law.  A separate Final Judgment will be entered.

**DONE** and **ORDERED** this _____4th_____ day of January, 2005.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE